HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JOHN RITCHIE, et al.,

          Plaintiffs,

     v.

CAPITOL INDEMNITY CORP.,

          Defendant.

CASE NO. C11-1903RAJ

ORDER

## I.  INTRODUCTION

This matter comes before the court on Plaintiffs' motion for partial summary judgment and Defendant's motion for summary judgment. Dkt. ## 10, 26.  Defendant requested oral argument, but the court finds oral argument unnecessary.  For the reasons stated below, the court GRANTS Plaintiffs' motion and DENIES Defendant's motion.

## II.  BACKGROUND

Plaintiffs John Ritchie, Thomas Wampold, and Gregory Welden collectively own and operate a hard-money lending business that they call "The Ritchie Group."  The court will collectively refer to the Plaintiffs as "Ritchie."

### A.  Ritchie Loses $220,000 After Transferring it to Avista at the Urging of Its Sole Escrow Officer.

In March 2010, Ritchie approached Avista Escrow Services ("Avista") to provide escrow services for a real estate transaction that would rescue a residential property in

ORDER – 1

Edgewood, Washington, from foreclosure and make Ritchie the senior lienholder on the property. Avista was, at all relevant times, a Washington limited liability company that Douglas Huntington, Scott Huntington, and Lennie Mueller co-owned as members. Luna Decl. (Dkt. # 11), Ex. 2 (S. Huntington Decl. ¶ 1). Ms. Mueller owned 25% of Avista and was its only licensed escrow officer.[1] *Id.* The record reflects that she drew a salary from Avista and conducted its day-to-day escrow business. *Id.*, Ex. 1 (S. Huntington Depo. at 30), Ex. 2 (S. Huntington Decl. ¶ 1). There is no dispute that Ms. Mueller was the sole Avista representative with whom Ritchie worked on the Edgewood transaction. Indeed, there is no dispute that Ms. Mueller was Avista's sole representative for all of its escrow transactions. Luna Decl., Ex. 1 (S. Huntington Depo. at 30) ("She – she ran – she was Avista.").

By the time Ritchie approached Ms. Mueller in March 2010, the Washington Department of Financial Institutions ("DFI") had suspected her and Avista of escrow improprieties for more than a year. In December 2008, DFI had issued a statement of charges accusing Avista of mishandling escrow funds in numerous transactions between 2005 and 2008. Luna Decl., Ex. 5. DFI proposed to revoke Avista's escrow agent license and to revoke Ms. Mueller's escrow officer license. *Id.* Ritchie was unaware of the DFI charges.

DFI issued a temporary cease-and-desist order in April 2010 that required Avista and Ms. Mueller to immediately stop offering escrow services. Luna Decl., Ex. 7. No one at Avista heeded the order or informed Ritchie about it.

From March 2010 to June 2010, Ms. Mueller communicated with Ritchie regularly about the Edgewood transaction. In response to several inquiries about the status of the transaction, she informed Ritchie that she was awaiting paperwork from

---

[1] The court adopts the jargon of Washington law, where a "licensed escrow agent" is a sole proprietorship or corporate entity that holds a license to act as an escrow agent and a "licensed escrow officer" is a "natural person handling escrow transactions" who holds a state-issued license. RCW § 18.44.011(9)-(10).

ORDER – 2

another party.  There is no question that everyone expected she would eventually direct Ritchie to transfer funds to Avista.  The record does not reveal when she first told Ritchie to transfer the funds.  No one disputes, however, that on June 18, Ritchie wired a deposit of $220,000 to an Avista account.  So far as Ritchie was aware, the Edgewood transaction was complete.

Later that summer, Ritchie discovered that the lender who had originally attempted to foreclose on the Edgewood property was continuing its efforts.  The lender informed Ritchie that it had never received the payment from Avista that would have extinguished its interest in the property.

Ritchie met with Ms. Mueller on August 9.  She claimed that the lender had made a mistake, and produced canceled checks that purported to show that Avista had transferred escrow funds to the lender.  Ritchie learned shortly thereafter that the checks were forgeries.

By August 19, acting in part on new information from Ritchie, DFI took over Avista, effectively putting it out of business.

No one disputes that Ritchie has been unable to recover the $220,000 it wired to Avista.  Beyond that, however, Ritchie provides little evidence about what happened to its money.  Ritchie provided no evidence at all about what Avista did with the money in its motion for summary judgment.  In its reply brief, it submitted over 150 pages of Avista's banking records, consisting of account statements and canceled checks.  Luna Reply Decl. (Dkt. # 20), Exs. 2-3.  Ritchie provides no summary of this evidence and makes no attempt to explain how it reveals the fate of its $220,000.  Ritchie also submitted an information that the King County Prosecutor filed in June 2011 charging Ms. Mueller with more than 10 counts of theft of funds from Ritchie.  *Id.*, Ex. 1. Attached to the information is a report from a DFI investigator that provides specific examples of what Ms. Mueller did with the Ritchie funds.  *Id.*  That report provides

ORDER – 3

relatively detailed information about what happened, but the court cannot consider it as evidence. The court takes judicial notice, however, of the King County Superior Court docket in the criminal proceeding against Ms. Mueller. *State v. Mueller*, No.11-1-06283-SEA. That docket reveals that Ms. Mueller recently pleaded guilty and is awaiting a sentence. Her conviction came after the parties completed briefing on these motions, and no one has attempted to explain what Ms. Mueller pleaded guilty to or what facts she admitted in her plea.

**B.     Ritchie Tries, Without Success, to Recover Its Money from the Insurer Who Issued Avista Its Statutorily-Mandated Fidelity Bond.**

Unable to recover its money from Avista, Ritchie turned to Defendant Capitol Indemnity Corporation ("Capitol"). The Washington Escrow Registration Act (RCW Ch. 18.44, "Escrow Act") requires that every licensed escrow agent obtain a fidelity bond "covering each corporate officer, partner, escrow officer, and employee of the applicant engaged in escrow transactions." RCW § 18.44.201(1)(a). There is no dispute that Capitol issued essentially the same fidelity bond to Avista each year beginning in 2004. There is also no dispute, however, that Capitol canceled Avista's fidelity bond on June 8, 2010, ten days before Ritchie transferred its money to Avista.

Capitol initially denied Ritchie's claim in December 2010 because only Avista itself had standing to claim benefits under the bond. Ritchie then pursued a state court suit against Avista to a default judgment, seizing Avista's property, including its claim on the fidelity bond. By August 2011, Ritchie renewed its claim to Capitol. Capitol again refused to pay the claim, this time citing a host of provisions in the fidelity bond.

Ritchie sued Capitol in King County Superior Court in October 2011. It contended not only that Capitol breached the fidelity bond, but that it acted in bad faith and violated Washington's Insurance Fair Conduct Act ("IFCA"). Capitol removed the case to this court. In the cross-motions for summary judgment now pending, Ritchie

ORDER – 4

1    seeks summary judgment that Capitol breached the fidelity bond; Capitol seeks summary

2    judgment that it did not breach the bond and that it did not violate IFCA.

3                                    **III.  ANALYSIS**

4            On a motion for summary judgment, the court must draw all inferences from the

5    admissible evidence in the light most favorable to the non-moving party.  *Addisu v. Fred*

6    *Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).  Summary judgment is appropriate

7    where there is no genuine issue of material fact and the moving party is entitled to a

8    judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party must initially show

9    the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

10   323 (1986).  The opposing party must then show a genuine issue of fact for trial.

11   *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The

12   opposing party must present probative evidence to support its claim or defense.  *Intel*

13   *Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).  The

14   court defers to neither party in resolving purely legal questions.  *See Bendixen v.*

15   *Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

16   **A.    Ritchie's Claim For Breach of the Fidelity Bond**

17           The parties' motions call for interpretation of the terms of Capitol's fidelity bond.

18   In most respects, this task is no different than interpreting the terms of an insurance

19   policy.  *See*, *e.g.*, *Estate of Jordan v. Hartford Accident & Indem. Co.*, 844 P.2d 403, 411

20   (Wash. 1993) (interpreting fidelity bond as insurance policy); *Fireman's Fund Ins. Co. v.*

21   *Puget Sound Escrow Closers, Inc.*, 979 P.2d 872, 878 (Wash. Ct. App. 1999) (same).  In

22   Washington, insurance policy interpretation is a legal question.  *Overton v. Consol. Ins.*

23   *Co.*, 38 P.3d 322, 325 (Wash. 2002) ("Interpretation of insurance policies is a question of

24   law, in which the policy is construed as a whole and each clause is given force and

25   effect.").  The court must give the terms of the policy a "fair, reasonable, and sensible

26   construction as would be given to the contract by the average person purchasing

27

28   ORDER – 5

insurance." *Id.* (internal quotation omitted).  Terms defined within a policy are to be construed as defined, while undefined terms are given their "ordinary and common meaning, not their technical, legal meaning." *Allstate Ins. Co. v. Peasley*, 932 P.2d 1244, 1246 (Wash. 1997).  Dictionaries may assist in determining the ordinary meaning of a term.  *Boeing Co. v. Aetna Cas. & Sur. Co.*, 784 P.2d 507, 511 (Wash. 1990).  If policy language on its face is susceptible to two different but reasonable interpretations, ambiguity exists.  *Peasley*, 932 P.2d at 1246 (cited in *Petersen-Gonzales v. Garcia*, 86 P.3d 210 (2004)); *Allstate Ins. Co. v. Hammonds*, 865 P.2d 560, 562 (Wash. Ct. App. 1994) (ambiguity exists "when, reading the contract as a whole, two reasonable and fair interpretations are possible.").  Extrinsic evidence may provide the meaning of an ambiguous term, but only where that evidence shows that both parties to the policy intended a particular meaning.  *Am. Nat'l Fire Ins. Co. v. B&L Trucking & Const. Co.*, 951 P.2d 250, 256 (Wash. 1998); *see also Quadrant Corp. v. Am. States Ins. Co.*, 110 P.3d 733, 737 (Wash. 2005) ("If a clause is ambiguous, [a court] may rely on extrinsic evidence of the intent of the parties to resolve the ambiguity.").  Because parties rarely negotiate the terms of an insurance policy, there is rarely evidence of the parties' mutual intent as to the meaning of a policy term.  Where extrinsic evidence does not resolve an ambiguity, the court must construe the ambiguous term in favor of the insured. *Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 15 P.3d 115, 141 (Wash. 2000); *see also Hammonds*, 865 P.2d at 562 (directing courts to resolve ambiguity against insurer "even where the insurer may have intended another meaning").

Because Capitol issued the fidelity bond to Avista to satisfy the requirements of the Escrow Act, the court must look to the Act when interpreting the bond's terms. *Estate of Jordan*, 844 P.2d at 408 ("[W]e interpret statutorily mandated bonds in light of the requirements of the relevant statute.").  A court must interpret a fidelity bond "to cover all of the circumstances covered by the [Escrow Act]." *Id.* at 412.

ORDER – 6

The fidelity bond memorializes Capitol's promise to indemnify as follows:

[S]ubject to the Declarations, Insuring Agreements, Definitions, Exclusions, Conditions and other terms of this Policy, we will pay for loss that you sustain resulting directly from acts committed or events occurring during the Policy Period . . . and discovered by you no later than 60 days from the end of said Policy Period.

Fid. Bond at 25 (¶ A) & 36.[2]  The bond uses "you" and "your" to refer to Avista, the only insured that the bond's declarations identify.  Fid. Bond at 22, 25.  No one disputes that Ritchie acquired whatever rights the fidelity bond confers on Avista, and that it has only the claims Avista would have had against Capitol.  *See Estate of Jordan*, 844 P.2d at 407 (explaining that a fidelity bond's assignee "stands in the shoes" of the bonded party).[3]

Contrary to Capitol's contention, the bond does not require that Avista sustain a loss during the policy period; it merely requires that Avista discover a loss within 60 days of the end of the policy period.  This is apparent from the plain language of the promise to indemnify, which uses the phrase "occurring during the Policy Period" only to modify "acts committed or events occurring."  The promise states no limitation on when the loss must occur, it requires only that Avista discover the loss within 60 days of the end of the policy period.[4]

---

[2] The court cites the terms of the fidelity bond (Luna Decl., Ex. 3) by the number at the lower right corner of each page and, where possible, the number and letter of the cited clause.

[3] In 2010, the Washington legislature amended the Escrow Act to designate consumers who suffer harm from the dishonest acts of the corporate officers of escrow agents as beneficiaries of the agents' fidelity bonds.  *See* H.B. 2564 (61st Leg. 2010) (amending RCW § 18.44.201(2)).  The parties agree that those amendments do not apply retroactively to the Capitol fidelity bond, which is why Capitol was able to force Ritchie to acquire Avista's claim before considering it.

[4] Capitol fails to explain (rather than merely assert) its conclusion that the fidelity bond requires a loss during the policy period.  Instead, it repeatedly notes that it changed its promise to insure via an endorsement.  It misunderstands the change.  Absent the endorsement, the fidelity bond would cover losses "resulting directly from acts committed or events occurring *at any time* . . . ." Fid. Bond at 25 (¶ A) (emphasis added).  The endorsement, by contrast, requires loss from "acts committed or events occurring *during the Policy Period* . . . ." Fid. Bond at 36 (emphasis added).  The effect of the change was to absolve Capitol of any obligation to indemnify for losses resulting from acts occurring *before* the policy period but discovered during the policy period or during an extended period defined at paragraph E.9.  The endorsement did not create a requirement that the loss occur during the policy period.

ORDER – 7

Moreover, the fidelity bond defines "Discovery of Loss" in a way that includes losses that have not yet ripened:

> Discovery of loss occurs when you first become aware of facts which would cause a reasonable person to assume that a loss covered by this insurance has been *or will be* incurred, even though the exact amount or details of loss may not then be known.

Fid. Bond at 30 (¶ E.6) (emphasis added).

To state a claim on the bond, Ritchie must show that within 60 days of the end of the policy period, Avista was aware of facts that would cause a reasonable person to assume that it had incurred a loss or that it would incur a loss in the future. No one disputes that the policy period ended on June 8, 2010, the effective date of Capitol's cancellation of the bond. No one disputes that in April 2010, Ms. Mueller knew that she and Avista were subject to the DFI cease-and-desist order that prohibited them from further escrow transactions. Finally, no one disputes that Ms. Mueller's misappropriation of Ritchie's money did not occur until at least June 18, the date that Ritchie transferred the money. From these undisputed facts, the court concludes that, as a matter of law, Avista suffered a loss as a result of acts during the policy period and discovered that loss within 60 days of the end of the policy period. The court now explains that conclusion.

First, the court concludes that Ms. Mueller acted dishonestly during the policy period. Whereas the promise to indemnify refers generically to "acts committed or events occurring," the bond's agreement to indemnify for "Employee Dishonesty" requires a dishonest act:

> We will pay for loss . . . resulting directly from dishonest acts committed by an **employee** . . . with the manifest intent to:
>
> a.    Cause you to sustain loss; and also
>
> b.    Obtain financial benefit . . . for
>
>     (1)    The **employee**; or
>
>     (2)    Any person or organization intended by the **employee** to receive that benefit.

ORDER – 8

Fid. Bond at 25 (¶ B.1) (emphasis in original).  No one attempts to argue that Ms. Mueller was not an "employee" within the meaning of the bond.  Fid. Bond at 26-27 (¶ C.4) (defining "employee" as a person whom "you compensate directly by salary, wages, or commissions" and whom "you have the right to direct and control while performing services for you").  Ritchie asserts that Ms. Mueller acted dishonestly between April 2010 and the end of the policy period by holding herself out as capable of finalizing the Edgewood transaction without informing Ritchie of the cease-and-desist order.  In the court's view, the more significant dishonest act was Ms. Mueller's failure to stop acting as an escrow officer.  There is no statute that required Ms. Mueller to disclose the cease-and-desist order,[5] but the statute authorizing DFI to issue those orders (RCW § 18.44.440) would be toothless if failure to abide by them were not deemed a dishonest act.  Because the court must interpret "dishonest act" in accordance with the purposes of the Escrow Act, Ms. Mueller's failure to abide by the cease-and-desist order was a dishonest act beginning in April 2010 and continuing until the end of the policy period.

The court need not discuss the bond's additional restrictions that the employee commit a dishonest act with "manifest intent" to cause a loss and obtain a financial benefit.  The court must give "no effect to those restrictions," because they are repugnant to the Escrow Act, which "requires that the bond cover '*any* fraudulent or dishonest acts' that result in a loss," not merely those "committed with the specific intent listed in the bond."  *Estate of Jordan*, 844 P.2d at 412 (construing language materially identical to paragraph B.1 of the Capitol bond) (emphasis in internal quotation in *Jordan*, quoting former RCW § 18.44.050, which is now RCW § 18.44.201).

Second, the court concludes as a matter of law that Ms. Mueller's dishonest act resulted in a "loss" to Avista.  The loss was the acceptance of $220,000 for an escrow transaction that Avista had no legal authority to consummate.  On the surface, the mere

---

[5] By contrast, when the DFI revokes an escrow agent's license, the agent must give notice within five days to the parties to all of the agent's pending escrow transactions.  RCW § 18.44.465.

ORDER – 9

acceptance of money might not appear to be a loss to Avista, which presumably retained control of the funds at least until Ms. Mueller embezzled them.  But at the moment Avista accepted the funds from Ritchie, it had violated the law (by accepting escrow funds while subject to the cease-and-desist order) and thus was liable to Ritchie for $220,000.  The Escrow Act requires a fidelity bond to protect against "the loss of money . . . belonging to the obligee, or in which the obligee has a pecuniary interest, or for which the obligee is legally liable . . . ."  RCW § 18.44.201(2).  The court is aware of no provision of the fidelity bond that would exclude this legal liability from the ambit of loss.  Even if there were such a provision, the court is mandated to "consider all of the provisions" of the Escrow Act "in determining what 'loss' the statutorily mandated bond covers."  *Estate of Jordan*, 844 P.2d at 408.  In *Jordan*, the Court considered whether the mere transfer of funds from an escrow agent's trust account to another of the agent's accounts constituted a loss.  *Id.*  The Court held that because the loss "resulted in [the escrow agent] being unable to fulfill its legal obligations as a trustee," it was a "'loss' within the meaning of the statute and the bond."  *Id.* at 409.  In this case, Avista's acceptance of Ritchie's money was unlawful from the outset, and thus gave rise to a legal liability to return the money.  The court concludes that this is a loss that the fidelity bond covers.

Third, the court concludes as a matter of law that Avista's loss resulted directly from Ms. Mueller's dishonest act.  There is no genuine dispute that the ultimate object of Ms. Mueller's continued misrepresentations to Ritchie from April 2010 to the end of the policy period was to induce Ritchie to transfer funds to Avista.  What is the purpose of holding oneself out (to a consumer of escrow services) as an officer licensed to consummate an escrow transaction, if not to consummate an escrow transaction?  Capitol protests that the law prohibits labeling a cause as "direct" where intervening acts were necessary to produce the consequence complained of.  What Capitol fails to do, however, is explain what intervening act was necessary to produce Avista's loss.  Capitol relies on

ORDER – 10

a decision from the Honorable Ricardo S. Martinez of this District to support its "intervening act" theory. *Pinnacle Processing Group, Inc. v. Hartford Cas. Ins. Co.*, No. C10-1126RSM, 2011 U.S. Dist. LEXIS 128203 (W.D. Wash. Nov. 4, 2011). In *Pinnacle*, the court considered a loss that occurred when merchants who received credit card processing services from the insured conspired with their customers to defraud the insured. *Id*. at *5-6. As a result of the fraud, the insured became liable to its own bank for "chargeback" liabilities after the bank was unable to recover funds from the merchants' banks. *Id*. at *13. Judge Martinez found that the chain of events leading to the insured's loss was too attenuated. *Id*. Here, by contrast, there are no third parties, and no intervening events of significance. Ms. Mueller dishonestly convinced Ritchie that she was a licensed escrow officer who had authority to conduct a specific escrow transaction on Avista's behalf. If an intervening act or actor was the cause of Ritchie's decision to transfer funds to Avista, Capitol has not identified it, and the court cannot imagine who or what it might be.

Fourth, Avista discovered its loss within 60 days of the end of the policy period. On June 18, only 10 days after the policy period, Avista knew that it was in possession of funds that it was legally liable to return to Ritchie. At that point, it knew it had suffered a loss; the only remaining question was whether subsequent events would impact the amount of that loss. As the court has already explained, however, the fidelity bond expressly acknowledges that uncertainty about how future events might impact a loss is not relevant. Fid. Bond at 30 (¶ E.6) (defining "Discovery of Loss"). Capitol's only attempt to avoid this conclusion is to contend that *Avista* did not discover the loss because the court should not impute Ms. Mueller's knowledge to Avista. The court observes that in all likelihood, Avista had knowledge of its loss without reference to Ms. Mueller because the law would charge Avista with knowledge of the contents of its bank accounts. Putting that aside, however, the court must impute Ms. Mueller's knowledge to

ORDER – 11

1   Avista.  The ordinary rule is that an agent's knowledge is imputed to its principal, subject

2   to an exception where the "agent acquires information which it would be to his advantage

3   to conceal from his principal . . . ."  *Puget Sound Nat'l Bank v. St. Paul Fire & Marine*

4   *Ins. Co.*, 645 P.2d 1122, 1127 (Wash. Ct. App. 1982) (internal quotation omitted).  That

5   exception, however, is subject to its own exception where the agent is the "sole

6   representative" of the principal.  *Id.*  In this case, it is undisputed that Ms. Mueller was

7   the sole representative of Avista with respect to the Ritchie transaction.  The court can

8   impute her knowledge of her unlawful action to Avista.

9           Capitol attempts, without success, to erect one final obstacle to Ritchie's claim:

10  the fidelity bond's exclusion for "Acts Committed by You or Your Partners."  Fid. Bond

11  at 28 (¶ D.1).  That exclusion applies to "[l]oss resulting from any dishonest act

12  committed by you or any of your partners whether acting alone or in collusion with other

13  persons."  *Id.*  Capitol contends, without explanation, that Ms. Mueller was a "partner" of

14  Avista.  The evidence reveals that she was a *member* of Avista, which is a limited

15  liability company.  A court must construe insurance policy exclusions strictly against the

16  insurer.  *Hayden v. Mut. of Enumclaw Ins. Co.*, 1 P.3d 1167, 1172 (Wash. 2000).  If

17  Capitol wished to exclude the acts of members of a limited liability company from the

18  bond's coverage, it was obligated to either do so expressly or to define "partner" in a way

19  that includes limited liability company members.  Its failure to do so is fatal to its attempt

20  to rely on the "partner" exclusion.

21  **B.    Ritchie's IFCA Claim**

22          Capitol's mistaken belief that it did not breach the fidelity bond is the foundation

23  of its request for summary judgment against Ritchie's IFCA claim.  IFCA gives a cause

24  of action to "[a]ny first party claimant to a policy of insurance who is unreasonably

25  denied a claim for coverage or payment of benefits by an insurer . . . ."  RCW

26  § 48.30.015(1).  Capitol did not argue that if it improperly denied coverage, it did so

27

28  ORDER – 12

reasonably.  Instead, it argued that it had not violated any of the provisions of the Washington Administrative Code enumerated at RCW § 48.30.015(5).   IFCA does not obligate an insured to prove a violation of those regulations to prove that an insurer unreasonably denied a claim.  Indeed, the statute does not obligate an insured to prove a violation of those regulations to obtain an award of attorney fees.  RCW § 48.30.015(2)-(3).  For that reason, the court has no need to consider Capitol's claims that it did not violate the regulations.  The court simply holds that, on the record before the court, a trier of fact could conclude that Capitol unreasonably denied coverage to Ritchie.

The court agrees, however, that Ritchie may invoke IFCA only as to Capitol's actions after Ritchie became a first-party claimant.  Until sometime in the summer of 2011, Ritchie had no right to assert a claim on the fidelity bond because it was not a beneficiary.  Only after it acquired Avista's rights under the policy did it become a first-party claimant.  The legislature chose to extend IFCA's protections only to first-party claimants.  The court must interpret IFCA in a way that respects that choice.  The court holds that IFCA does not apply to an insurer's actions toward someone other than a first-party claimant.

The court reaches no conclusion as to whether Ritchie has properly asserted a claim for the tort of bad faith independent of its IFCA claim.

### IV.  CONCLUSION

For the reasons stated above, the court GRANTS Ritchie's motion for partial summary judgment. Dkt. # 10.  The court DENIES Capitol's motion for summary judgment. Dkt. # 26.

DATED this 31st day of July, 2012.

The Honorable Richard A. Jones
United States District Court Judge

ORDER – 13